## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
PAUL T. HARDY, <u>et al.</u>,           )
                                        )
        Plaintiffs,      )
                                        )
      v.                  )     Civil Action No. 11-1739 (RBW)
                                        )
MARGARET A. HAMBURG, <u>et al.</u>,     )
                                        )
        Defendants.      )
_____ )

## MEMORANDUM OPINION

The plaintiffs, six former and current employees of the Food and Drug Administration ("FDA"), filed this civil lawsuit against the defendants, Margaret A. Hamburg, the Commissioner of the FDA; the FDA; Kathleen Sebelius, the Secretary of the Department of Health and Human Services ("DHHS"); the DHHS; Regina Benjamin, the Surgeon General of the Public Health Service ("Public Health Service"); and the Public Health Service, alleging violations of the First, Fourth, and Fifth Amendments of the Constitution and the Lloyd-LaFollette Act. Second Amended Complaint ("Am. Compl.") ¶¶ 127-97. Currently before the Court is the Defendants' Motion to Dismiss for lack of subject-matter jurisdiction ("Defs.' Mot."). After carefully considering the parties' submissions,[1] the Court concludes that it must grant the motion to dismiss for the reasons set forth below.

---

[1] In addition to the filings already identified, the Court considered the following filings by the parties in reaching its decision: (1) the Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss ("Defs.' Mem."); (2) the Plaintiffs' Opposition to Defendants' Motion to Dismiss ("Pls.' Opp'n"); (3) the Reply in Support of Defendants' Motion to Dismiss ("Defs.' Reply"); and (4) the Defendants' Notice of Supplemental Authority ("Defs.' Notice").

# I. STATUTORY BACKGROUND

The passage of the Civil Service Reform Act of 1978 ("CSRA"), Pub. L. No. 95-454, 92 Stat. 1111 (codified as amended in scattered sections of 5 U.S.C.), established a comprehensive framework for federal employees to have "prohibited personnel practices" of agencies reviewed and remedied administratively.[2]  5 U.S.C. § 2302 (2012); see also United States v. Fausto, 484 U.S. 439, 445-49 (1988) (explaining how the comprehensive nature of the CSRA precludes certain judicial review of personnel actions other than as provided by the statute).  The Whistleblower Protection Act of 1989 subsequently "amend[ed] the list of prohibited personnel practices under the framework of the CSRA" to include reprisals for whistleblower activity. Heard v. U.S. Dep't of State, No. 08-cv-02123(RBW), 2010 WL 3700184, at *6 n.7 (D.D.C. Sept. 17, 2010) (Walton, J.); see also 5 U.S.C. § 2302(b)(8).  "A federal employee who alleges unlawful retaliation for whistleblowing must first bring his claim to the Office of Special Counsel." Heard, 2010 WL 3700184 at *6 (citing 5 U.S.C. § 1214 and Weber v. United States, 209 F.3d 756, 757-58 (D.C. Cir. 2000)).  "If the [Office of Special Counsel] finds an absence of wrongdoing, the employee can appeal that decision to the Merit Systems Protection Board, 5 U.S.C. §§ 1214(a)(3), 1221." Id.  Without exhausting these administrative remedies, this Court lacks jurisdiction.[3] Weaver v. U.S. Info. Agency, 87 F.3d 1429, 1433 (D.C. Cir. 1996) ("Under the CSRA, exhaustion of administrative remedies is a jurisdictional prerequisite to suit."); Heard, 2010 WL 3700184, at *6 n.7 (Walton, J.) ("Because the [Whistleblower Protection Act] amends the list of prohibited personnel practices under the framework of the CSRA, the exhaustion

---

[2]  An "agency" is defined in 5 U.S.C. § 2302(a)(2)(C) as an "Executive agency and the Government Printing Office."

[3]  And even then, the Court's jurisdiction is limited to certain types of cases. See Kloeckner v. Solis, _ U.S. _, _, 133 S. Ct. 596, 601 (2012).

discussion in <u>Weaver</u> also applies to the [Whistleblower Protection Act]." (internal citation omitted)).

## II.  FACTUAL BACKGROUND

### A.  The Plaintiffs

"The [p]laintiffs are a group of six doctors and scientists" who have made public statements about the allegedly "serious managerial and medical misconduct within the [FDA's] Center for Devices and Radiological Health," which is "the unit within the FDA with the responsibility to review and approve the use of medical devices."  Pls.' Opp'n at 1; <u>see also</u> Am. Compl. ¶¶ 15, 17, 19, 72.  Doctor ("Dr.") R. Lakshmi Vishnuvajjala and Nancy G. Wersto are current employees of the FDA.  Am. Compl. ¶¶ 7, 8.  The other plaintiffs are not.  <u>Id.</u> ¶¶ 3-6.  Dr. Ewa M. Czerska and Dr. Robert C. Smith are both former employees of the FDA.  <u>Id.</u> ¶¶ 4, 5. Paul T. Hardy is a former officer of the Public Health Service Commissioned Corps.  <u>Id.</u> ¶ 3; Pls.' Opp'n at 2.  During his tenure as an officer in the Public Health Service Commissioned Corps, Mr. Hardy was assigned to work for the FDA.  Am. Compl. ¶ 118; Pls.' Opp'n at 2.  Dr. Julian Nicholas is a "former federal contractor, [who] work[ed] for the FDA through the Oak Ridge Institute for Science and Education . . . program."  Am. Compl. ¶ 6; Pls.' Opp'n at 2.

### B.  The Plaintiffs' Alleged Whistleblower Activities

Beginning no later than November 2008, the plaintiffs began "rais[ing] significant health and safety concerns regarding the FDA's regulatory review and clearance/approval of [allegedly] unsafe and ineffective medical devices."  Pls.' Opp'n at 3; Am. Compl. ¶¶ 15, 17, 46-58, 72. The plaintiffs also alleged that FDA doctors and scientists had been "intimidated and coerced" into "modify[ing] their scientific reviews, conclusions[,] and recommendations in violation of law."  Pls.' Opp'n at 4 (internal quotations omitted); Am. Compl. ¶ 15.  "These concerns were

raised both inside and outside the FDA, and were specifically raised with [m]embers of Congress, [then] President-elect Barack Obama's [t]ransition [t]eam, [then-]President[-elect Barack] Obama, and representatives of the news media." Pls.' Opp'n at 3; Am. Compl. ¶¶ 15, 17, 19, 46-58, 72.

For example, in November 2008, several of the plaintiffs—Mr. Hardy, Dr. Czerska, Dr. Smith, and Ms. Wersto—"were among a group of FDA scientists who" informed "the House Energy and Commerce Committee about [alleged] managerial misconduct in the FDA." Am. Compl. ¶ 15. Similarly, in January 2009, Mr. Hardy, Dr. Czerska, Dr. Smith, and Ms. Wersto joined five other FDA employees to sign and send a letter to then President-elect Barack Obama's transition team that "raised numerous issues of public concern, including [alleged] corruption within the FDA's device review process, managerial misconduct, dangers to public health and welfare, and retaliation against whistleblowers." Id. ¶ 17. The FDA learned of the letter and its nine signatories, and began allegedly referring to those "signatories as the 'FDA 9.'" Id. ¶ 18. Later that same year, in September 2009, "a group of FDA whistleblowers, including Dr. Nicholas . . . and Dr. Smith," continued to "sp[eak] with members of the House Energy and Commerce Committee" about "their concerns regarding" the FDA's review and approval of allegedly unsafe and ineffective medical devices. Id. ¶ 58. The following year, in March 2010, the New York Times published an article concerning the plaintiffs—"the FDA whistleblowers"—and their warnings to the FDA about its approval of allegedly "ineffective and dangerous devices and ignoring or suppressing the concerns of its own scientists." Pls.' Opp'n at 4; Am. Compl. ¶¶ 72-75.

### C. The Defendants' Alleged Conduct in Response to the Plaintiffs' Whistleblower Activities

"Sometime between January 2009 and March 2010," under the auspices of the DHHS, the FDA allegedly "commenced '[t]argeted [s]urveillance'" on the plaintiffs in response to their whistleblower activities. Pls.' Opp'n at 5-8; <u>id.</u> at 6 ("This [t]argeted [s]urveillance was directly triggered based on the whistleblower disclosures [that the] [p]laintiffs were making (or suspected of making) to various outside entities . . . ."); Am. Compl. ¶¶ 21-45. According to the plaintiffs:

> "Targeted [s]urveillance" was conducted on the plaintiffs (and other similarly situated FDA employees) because these employees were identified as whistleblowers, i.e.[,] employees who raised health and safety concerns and allegations of official misconduct that were protected under federal law and the United States Constitution. Employees [were] selected for [t]argeted [s]urveillance based on the viewpoint of their speech, and specifically because these employees have, or are suspected of having, criticized the FDA to Members of Congress, the news media or appropriate law enforcement agencies.

<u>Id.</u> ¶ 28; <u>see also</u> <u>id.</u> ¶¶ 26, 33, 99. The plaintiffs further allege that "'[t]argeted [s]urveillance' is distinct from 'routine' system monitoring of employee emails, for which the FDA and HHS also conduct." <u>Id.</u> ¶ 27. They also contend that:

> Pursuant to its [t]argeted [s]urveillance operation, the FDA secretly installed or activated spyware on the government-owned computers, hardware, and networks used by the [p]laintiffs. The spyware took real-time pictures, or "screen shots" (a.k.a. "snapshot recordings") of the computer screens being used by the [p]laintiffs, while the [p]laintiffs were using the computers or networks. These screen shots enabled FDA officials to secretly view information that appeared on each of the [p]laintiffs' computer screens, even if the information was transitory and not stored within the computer itself.

<u>Id.</u> ¶ 34.

Further, the plaintiffs allege that using "targeted surveillance," the FDA acquired "confidential and/or privileged work product, tactics and strategy that the [p]laintiffs were using or planning to use as a result of [the] FDA intercepting [p]laintiffs' [p]rivate [e]-mail

communications with" third parties including "private attorneys" and "other proper authorities."[4]
Id. ¶ 40; see also id. ¶¶ 42-44 (alleging instances where the FDA discovered existence of
"confidential work product" and "intercepted [p]rivate [e]-mails" from various plaintiffs); Pls.'
Opp'n at 11-12.

In addition to "[t]argeted surveillance," the plaintiffs represent that the defendants took
several "other retaliatory actions" against the plaintiffs for their whistleblower activities. Am.
Compl. ¶ 126 (emphasis added); id. ¶¶ 30, 158, 160, 164, 165, 169, 170, 196. For example, the
plaintiffs contend that several of the plaintiffs found themselves unemployed as a "direct result"
of their whistleblower activities. Pls.' Opp'n at 9-10 ("As a direct result of retaliation based on
the protected speech of the [p]laintiffs, or based directly on information obtained by the FDA as
part of the [t]argeted [s]urveillance, four of the [p]laintiffs, Drs. Smith, Czerska and Nicholas,
and Mr. Hardy, were either fired by the FDA or had their employment contracts terminated.");
id. at 9 ("The FDA [t]erminated, or [c]aused the [t]ermination, of [f]our [w]histleblowers[.]");
Am. Compl. ¶¶ 61-65 (alleging that Dr. Nicholas did not have his employment contract
renewed); id. ¶¶ 87-91 (alleging that Dr. Smith did not have his employment contract renewed);
id. ¶ 103 (alleging that the FDA terminated Dr. Czerska after 23 years of service); Pls.' Opp'n at
3 (same); Am. Compl. ¶¶ 107-114 (alleging that Mr. Hardy was removed from the Public Health
Service).

Other retaliatory actions alleged by the plaintiffs included the issuance of warning letters
or negative performance reviews, e.g., Am. Compl. ¶ 104 ("On or about February 25, 2011, Dr.
Vishnuvajjala received a warning letter from her FDA supervisor . . . that the FDA had

_____

[4] Beginning in early 2010, "Dr. Smith, who is a licensed attorney," served as legal counsel for several FDA
employees, including Mr. Hardy, Dr. Czerska, Dr. Nicholas, Dr. Vishnuvajjala, and Ms. Wersto, who were
"prepar[ing] a complaint of FDA misconduct with the Office of Special Counsel." Am. Compl. ¶ 84.

intercepted [p]rivate [e]mails sent to [her] . . . and that [she] should have reported those conversations to FDA management."); id. ¶ 158 (alleging "extremely negative performance review" for Mr. Hardy), and threats of disciplinary action, e.g., id. ¶ 88 (alleging that during administrative leave, the FDA instructed Dr. Smith "not to conduct, transact[,] or speak to any FDA employees and others about FDA business matters" and "threatened [him] with disciplinary action if he disobeyed this instruction" (internal quotations omitted)); id. ¶¶ 174-76 (alleging "threats of disciplinary action against [Dr. Vishnuvajjala and Ms. Wersto]").

### D. Complaints Filed by the Plaintiffs With the Office of Special Counsel

On or about February 14, 2012, the plaintiffs filed a complaint with the Office of Special Counsel "concerning FDA misconduct." Defs.' Mem., ECF No. 31-4, Exhibit ("Ex.") 4 (Nat'l Whistleblowers Ctr. Press Release) at 1 ("On January 25, 2012, and February 14, 2012, six federal employee whistleblowers filed complaints in U.S. District Court . . . and before the U.S. Office of Special Counsel demonstrating that the federal government targeted whistleblowers for intrusive, covert surveillance."); see also Am. Compl. ¶ 121.[5]

Following allegations that "the [FDA] reviewed disclosures intended specifically for [the Office of Special Counsel]," and that "the [FDA] also monitored communications of employees who were suspected of blowing the whistle on [the] FDA's approval of unsafe medical devices," the Office of Special Counsel "broadened the scope of [its] . . . investigation into the surveillance of employees' emails by the [FDA]." Defs.' Mem., ECF No. 31-6, Ex. 6 (Office of Special Counsel Press Release) at 1; see also Defs.' Mem., ECF No. 31-5, Ex. 5 (Office of Special

---

[5] The plaintiffs filed their First Amended Complaint with the Court on January 25, 2012. ECF No. 2. Further, the plaintiffs' lead attorneys have the following positions at The National Whistleblowers Center: Executive Director and General Counsel. Compare Am. Compl. at 41 (listing counsel for the plaintiffs), with Defs.' Mem., ECF No. 31-3, Ex. 3 (Nat'l Whistleblowers Ctr. Staff) at 1 (identifying counsel in positions of Executive Director and General Counsel).

Counsel Letter to Congressional Members) at 1 ("[The Office of Special Counsel] is troubled by evidence suggesting that the FDA used covert surveillance as a tool to retaliate against whistleblowers and the pattern of retaliation alleged by complainants . . . . [The Office of Special Counsel] has broadened the scope of an existing reprisal investigation . . . ."); id. at 1 n.1 (noting that the broadened investigation will focus on the "prohibited personnel practices that the complainants have alleged").

On May 31, 2012, the Office of Special Counsel made certain findings with respect to the plaintiffs' grievances identified in their complaints, "trigger[ing] a number of additional review procedures." Id. ¶¶ 121-23. While this administrative review process was pending, the plaintiffs concurrently filed this lawsuit. See generally, id.; Defs.' Mem., ECF No. 31-4, Ex. 4 (Nat'l Whistleblowers Ctr. Press Release) at 1 ("On January 25, 2012, and February 14, 2012, six federal employee whistleblowers filed complaints in U.S. District Court . . . and before the U.S. Office of Special Counsel demonstrating that the federal government targeted whistleblowers for intrusive, covert surveillance." (emphasis added)).

### III.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(1) allows a party to move to dismiss "for lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1). A motion to dismiss under Rule 12(b)(1) "presents a threshold challenge to the [C]ourt's jurisdiction." Haase v. Sessions, 835 F.2d 902, 906 (D.C. Cir. 1987). When reviewing such a motion, the Court must "assume the truth of all material factual allegations in the complaint and 'construe the complaint liberally, granting [the] plaintiff the benefit of all inferences that can be derived from the facts alleged.'" Am. Nat'l Ins. Co. v. FDIC, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (citation omitted). However, because "[f]ederal courts are courts of limited jurisdiction," it is "presumed that a cause lies outside

th[eir] limited jurisdiction," Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377

(1994), and "the [p]laintiff bears the burden of establishing by a preponderance of the evidence

that the Court possesses jurisdiction," Hollingsworth v. Duff, 444 F. Supp. 2d 61, 63 (D.D.C.

2006). Accordingly, "the court must give the plaintiff[s'] factual allegations closer scrutiny

when resolving a Rule 12(b)(1) motion than would be required for a Rule 12(b)(6) motion for

failure to state a claim." Byrum v. Winter, 783 F. Supp. 2d 117, 122 (D.D.C. 2011) (citing

Macharia v. United States, 334 F.3d 61, 64, 69 (D.C. Cir. 2003)). Finally, in determining

whether it has jurisdiction, the Court "may consider materials outside of the pleadings." Jerome

Stevens Pharm., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

## IV.    LEGAL ANALYSIS

### A.  Whether Certain Claims Asserted by the Plaintiffs are Precluded by the Civil Service Reform Act

If the administrative and remedial scheme set forth under the CSRA can resolve the

claims that the plaintiffs have alleged in their complaint before this Court, then the plaintiffs

must use that scheme to seek redress and the Court is precluded from exercising jurisdiction over

the plaintiffs' claims.[6] See Bush v. Lucas, 462 U.S. 367, 388-89 (1983) (explaining that the

application of the CSRA forecloses private causes of action and provides for administrative

remedies). Because the "[CSRA] . . . exclusivity does not turn on the constitutional nature of an

employee's claim, but rather on the type of the employee and the challenged employment

action," Elgin v. Dep't of Treasury, _ U.S. _, _, 132 S. Ct. 2126, 2136 (2012) (emphasis added),

the Court will address each of these components in turn.

---

[6] At the outset, the Court notes that the plaintiffs' allegations about the defendants, if true, are troubling. In deciding the defendants' motion to dismiss, however, the Court is not addressing the merits of any of the plaintiffs' claims against the defendants. The defendants' motion only concerns the Court's jurisdiction to adjudicate the plaintiffs' claims.

### 1. The "Employee" Status of the Plaintiffs Other Than Mr. Hardy[7]

The CSRA defines a federal "employee" as "an individual who is appointed in the civil service by" the officers designated in 5 U.S.C. § 2105(a)(1). "The CSRA also divides federal employees into four broad groups: (1) those in the competitive civil service; (2) those who are preference eligible; (3) those in the excepted civil service; and (4) probationers, being those who have one year or less of service." Harrison v. Bowen, 815 F.2d 1505, 1510 (D.C. Cir. 1987); see also 5 U.S.C. §§ 2101, 2102, 2103. "The substantive rights and procedural protections to which any particular employee is entitled often depend upon where he or she falls in this typology." Harrison, 815 F.2d at 1510. Here, the parties do not dispute that each of the plaintiffs' "employee" statuses are governed by 5 U.S.C. § 2105(a)(1). See Pls.' Opp'n at 37-38; Defs.' Reply at 12-14. And they agree that Dr. Czerska, Dr. Vishnuvajjala, and Ms. Wersto "were (or are) federal employees covered under the CSRA." Pls.' Opp'n at 3; see Defs.' Reply at 13.

The parties, however, dispute the applicability of the CSRA to Dr. Nicholas and Dr. Smith. See Pls.' Opp'n at 14-15, 37-38, 44. Nevertheless, pursuant to the CSRA, Dr. Nicholas and Dr. Smith filed complaints with the Office of Special Counsel, which contain the same type of allegations that are at issue before this Court: the defendants' approval and use of retaliation against whistleblowers. See Defs.' Mem., ECF No. 31-4, Ex. 4 (Nat'l Whistleblowers Ctr. Press Release) at 1 ("six federal employee whistleblowers filed complaints . . . before the U.S. Office of Special Counsel demonstrating that the federal government targeted whistleblowers for intrusive, covert surveillance"); Defs.' Mem., ECF No. 31-5, Ex. 5 (Office of Special Counsel Letter to Congressional Members) at 1 (alleging "FDA used covert surveillance as a tool to retaliate against whistleblowers" and the FDA's "pattern of retaliation"); Am. Compl. ¶¶ 28, 33.

---

[7] Hereinafter, unless otherwise noted, the Court's reference to "the plaintiffs" will not include Mr. Hardy as the resolution of the motion to dismiss him as a plaintiff has been decided on grounds outside of the CSRA framework.

Confronted by an ongoing administrative proceeding that could potentially avoid piecemeal and duplicative litigation, the Court will withhold review of their claims until a later time, if necessary.

Although the doctrine of ripeness has constitutional and prudential components, <u>see Nat'l Treasury Emps. Union v. United States</u>, 101 F.3d 1423, 1427-28 (D.C. Cir. 1996), this case only requires the Court to address the latter. "[T]he ripeness doctrine exists to prevent the courts from wasting . . . resources by prematurely entangling [them]selves in abstract disagreements, and, where . . . other branches of government are involved, to protect the other branches from judicial interference until their decisions are formalized and their 'effects felt in a concrete way by the challenging parties.'" <u>Id.</u> (quoting <u>Abbott Labs. v. Gardner</u>, 387 U.S. 136, 148-49 (1967). The application of the doctrine requires a two-part analysis: (1) whether the issues are fit for judicial review; and (2) whether the Court's refusal to consider the issues will create hardship on the parties. <u>Id.</u> If a challenged decision is not "fit" for review, "the petitioner must show hardship in order to overcome a claim of lack of ripeness." <u>Fla. Power & Light Co. v. EPA</u>, 145 F.3d 1414, 1421 (D.C. Cir. 1998). In assessing the fitness prong, courts evaluate "whether the agency action is final; whether the issue presented for decision is one of law which requires no additional factual development; and whether further administrative action is needed to clarify the agency's position." <u>Action Alliance of Senior Citizens v. Heckler</u>, 789 F.2d 931, 940 (D.C. Cir. 1986).

Here, neither prong of the ripeness analysis is satisfied. The fact that Dr. Nicholas and Dr. Smith are currently seeking administrative relief under the CSRA for allegations concerning the defendants' reprisals for their whistleblower activities, and that the administrative investigation into their allegations is pending and have not been terminated for want of

"employee" status under the CSRA, leaves the Court to conclude that their claims are not fit for review. Additionally, administrative action is needed to clarify their "employee" statuses under the CSRA.[8] And notwithstanding the potential lack of "employee" status on the part of either plaintiff, because administrative review has been undertaken, it may result in the satisfactory resolution of their claims, thereby relieving the Court of a need to adjudicate their claims. Toca Producers v. F.E.R.C., 411 F.3d 262, 266 (D.C. Cir. 2005) ("Staying our hand until the conclusion of the ongoing administrative proceeding could therefore avoid a piecemeal, duplicative, tactical and unnecessary appeal which is costly to the parties and consumes limited judicial resources." (internal quotations and alterations omitted)); Nat'l Treasury, 101 F.3d at 1431 ("[T]he usually unspoken element of the rationale underlying the ripeness doctrine . . . [is that i]f [the Court] do[es] not decide it now, [it] may never need to. Not only does this rationale protect the expenditure of judicial resources, but it comports with [the Court's] theoretical role as the governmental branch of last resort. Article III courts should not make decisions unless they have to." (internal citation omitted)). Further, the Court sees no cognizable hardship to either Dr. Nicholas or Dr. Smith resulting from any delay in the Court's review of their claims.[9]

---

[8] The ongoing administrative investigation of Dr. Nicholas' complaint appears to conflict with case law holding that federal contractors are outside of the scope of the CSRA. See Thompson v. Merit Sys. Prot. Bd., 421 F.3d 1336, 1338-39 (Fed. Cir. 2005) (reasoning that an employee of an independent government contractor does not necessarily fall under the CSRA); Navab-Safavi v. Broad. Bd. of Governors, 650 F. Supp. 2d 40, 67 n.14 (D.D.C. 2009) (agreeing that "because plaintiff is a contractor and not an employee, the [CSRA] has no application" (internal citations omitted)), aff'd sub nom. Navab-Safavi v. Glassman, 637 F.3d 311 (D.C. Cir. 2011).

[9] The plaintiffs understand that Dr. Smith—even if he is not an employee under the CSRA—should first attempt to exhaust possible administrative remedies, because they ask the Court to dismiss claims relevant to him "without prejudice" so that they can be re-plead if there is a "final decision by the [Merit Systems Protection Board] dismissing Dr. Smith's termination claim on jurisdictional grounds." Pls.' Opp'n. at 45. Further, the plaintiffs ask the Court to grant "jurisdictional discovery" to ascertain whether Dr. Smith is subject to the CSRA. Pls.' Opp'n at 44. The Court declines to do so as his claims are not ripe for review.

### 2. The Challenged Employment Actions

"A primary purpose of the CSRA was to safeguard employees-tenured and non-tenured-who 'blow the whistle' on illegal or improper official conduct." <u>Wren v. Merit Sys. Prot. Bd.</u>, 681 F.2d 867, 872 (D.C. Cir. 1982); <u>see also</u> <u>Frazier v. Merit Sys. Prot. Bd.</u>, 672 F.2d 150, 152 (D.C. Cir. 1982) ("A central purpose of the [CSRA] is to provide increased protection for 'whistleblowers,' federal employees seeking to disclose wrongdoing in the government."). Indeed, "[u]nder no circumstances does the [CSRA, as amended by the Whistleblower Protection Act,] grant . . . [a] District Court jurisdiction to entertain a whistleblower cause of action brought directly before it in the first instance." <u>Stella v. Mineta</u>, 284 F.3d 135, 142 (D.C. Cir. 2002).

The CSRA prohibits agencies from taking or threatening to take certain "personnel action[s]," <u>i.e.</u>, reprisals against employees for whistleblower activities. <u>See</u> 5 U.S.C. § 2302(b)(8); <u>Heard</u>, 2010 WL 3700184, at *6 n.7 (Walton, J.). Personnel actions are broadly defined to include disciplinary or corrective actions, changes in pay, benefits or awards, changes in duties, responsibilities or working conditions. <u>See</u> 5 U.S.C. § 2302(a)(2); <u>Weaver</u>, 87 F.3d at 1432-33 (noting that 5 U.S.C. § 2302(a)(2)(A)(iii) covers dismissals and admonishments). Prohibited personnel actions also include the treatment and management of employees in a manner that violates "merit system principles," 5 U.S.C. § 2302(b)(12); <u>id.</u> § 2301(b), such as failing to treat employees "with proper regard for their privacy and constitutional rights," <u>id.</u> § 2301(b)(2), or failing to "protect[] [employees] against reprisal for [whistleblowing]," <u>id.</u> § 2301(b)(9).

The plaintiffs have alleged no shortage of facts establishing that the defendants took, or threatened to take, a variety of prohibited personnel actions against them for their whistleblower activities. <u>See, e.g.</u>, Am. Compl. ¶ 126 (alleging a "[t]argeted surveillance program conducted

by the FDA, along with other <u>retaliatory actions</u>") (emphasis added)); <u>id.</u> at 21 (alleging "[retaliation against the other whistleblowers]"). For example, the plaintiffs allege that the "terminat[ions]" of Drs. Smith, Czerska and Nicholas, and Mr. Hardy were a "direct result" of their whistleblower activities. Pls.' Opp'n at 9-10 ("As a direct result of retaliation based on the protected speech of the [p]laintiffs . . . four of the [p]laintiffs, Drs. Smith, Czerska and Nicholas, and Mr. Hardy, were either fired by the FDA or had their employment contracts terminated."); <u>id.</u> at 9 ("The FDA [t]erminated, or [c]aused the [t]ermination, of [f]our [w]histleblowers[.]"); Am. Compl. ¶¶ 61-65, 87-91, 103, 107-14, 120; <u>see also</u> 5 U.S.C. § 2302(a)(2)(A)(iii). The plaintiffs also allege that warning letters and negative performance reviews were consequences the plaintiffs suffered as a result of their whistleblower activities, Am. Compl. ¶ 104 ("Dr. Vishnuvajjala received a warning letter from her FDA supervisor that the FDA had intercepted [p]rivate [e]mails sent to [her] . . . and that [she] should have reported those conversations to FDA management."); <u>id.</u> ¶ 158 (Mr. Hardy received an "extremely negative performance review"), as well as threats of disciplinary action, <u>id.</u> ¶ 88 (while on administrative leave, the FDA instructed Dr. Smith "not to conduct, transact, or speak to any FDA employees and others about FDA business matters" and "threatened [him] with disciplinary action if he disobeyed this instruction" (internal quotations omitted)); <u>id.</u> ¶¶ 174-76 (alleging "threats of disciplinary action against [Dr. Vishnuvajjala and Ms. Wersto]"); <u>see also</u> 5 U.S.C. § 2302(a)(2)(A)(iii).

Whether the alleged "targeted surveillance" or threat of "targeted surveillance" by the defendants in retaliation for the plaintiffs' whistleblowing activities is a prohibited "personnel action" appears to be a matter of first impression in this Circuit. "Targeted surveillance" is not explicitly listed under 5 U.S.C. § 2302(a)(2) as a "personnel action." Considering, however, that a "central purpose of the [CSRA] is to provide increased protection for 'whistleblowers,'"

Frazier, 672 F.2d at 152, and this Circuit has unequivocally stated that "[u]nder no circumstances does the [CSRA, as amended by the Whistleblower Protection Act,] grant . . . the District Court jurisdiction to entertain a whistleblower cause of action brought directly before it in the first instance," Stella, 284 F.3d at 142 (emphasis added); see also Heard, 2010 WL 3700184, at *6 n.7 (Walton, J.), the Court concludes that the defendants' "targeted surveillance" is best construed as a "disciplinary or corrective action" under the CSRA. See 5 U.S.C. § 2302(a)(2)(A)(iii).

The plaintiffs' allegations lend further support for the Court's conclusion, as they portray the defendants' "targeted surveillance" as a measure that was implemented to either "discipline" or "correct" the whistleblower activities of the plaintiffs. See, e.g., Pls.' Opp'n at 6 (explaining that the "[t]argeted [s]urveillance was directly triggered based on the whistleblower disclosures [the] [p]laintiffs were making (or suspected of making) to various outside entities"); Am. Compl. ¶ 70 ("As a direct consequence of her association with the whistleblower group, the FDA targeted Dr. Vishnuvajjala by monitoring and intercepting her private communications." (emphasis added)); id. ¶ 126 ("The [t]argeted [s]urveillance program conducted by the FDA, along with the other retaliatory actions described in this complaint, have created a chilling effect on plaintiffs and other similarly situated employees/contractors[.]"); id. ¶ 148 ("Dr. Czerska, Mr. Hardy, Dr. Nicholas, Dr. Vishnuvajjala, and Ms. Wersto . . . each was targeted for punitive [t]argeted [s]urveillance[.]" (emphasis added)). Further bolstering this Court's conclusion is the fact that the plaintiffs have complaints under investigation by the Office of Special Counsel—an administrative body that can only review allegations from federal employees concerning prohibited personnel actions. See 5 U.S.C. § 1214(a)(1)(A) ("The Special Counsel shall receive any allegation of a prohibited personnel practice and shall investigate the allegation to the extent necessary to determine whether there are reasonable grounds to believe that a prohibited

personnel practice has occurred, exists, or is to be taken." (emphasis added)); Defs.' Mem., ECF No. 31-5, Ex. 5 (Office of Special Counsel Letter to Congressional Members) at 1 n.1 (noting that the Office of Special Counsel broadened its investigation to focus on the "prohibited personnel practices that the complainants have alleged" (emphasis added)); Defs.' Mem., ECF No. 31-6, Ex. 6 (Office of Special Counsel Press Release) at 1 (deciding to "broaden[] the scope of [the] . . . investigation into the surveillance of employees' emails by the [FDA]" because "the whistleblowers allege[d] that the [FDA] reviewed disclosures intended specifically for [the Office of Special Counsel], and that the [FDA] also monitored communications of employees who were suspected of blowing the whistle on [the] FDA's approval of unsafe medical devices").  And these complaints, which have not yet been dismissed on the grounds that they are not founded upon personnel actions, Am. Compl. ¶¶ 121-23 (describing findings of the Office of Special Counsel and explaining that those findings have "trigger[ed] a number of additional review procedures" under the CSRA), are based on substantially the same allegations that are before the Court.  Thus, the Court deems the defendants' "targeted surveillance" as a "disciplinary or corrective action" that falls within the scope of the CSRA.

In short, for purposes of the defendants' motion to dismiss, the Court will analyze each claim in the complaint as if the plaintiffs were subject to the administrative and remedial scheme set forth in the CSRA.

**B.  The Plaintiffs' Claims**

**a.  Claims One Through Four, Six Through Eight, And Ten**

Claims one through four, six through eight, and claim ten, are premised on the defendants' alleged reprisals against the plaintiffs for their whistleblower activities.  See Am. Compl. at 25-29 (focusing bases of constitutional violations in claims one through four on the

defendants' "targeted surveillance" of the plaintiffs and the consequences thereof); id. at 30 (predicating sixth claim on the FDA's termination of Dr. Smith "in retaliation for his speech on matters of public concern"); id. at 31 (asserting in the seventh claim that the "FDA terminated Dr. Nicholas from public employment in retaliation for his speech on matters of public concern"); id. at 32 (identifying the "targeted surveillance" program and "threats of disciplinary action" as bases for claim eight, which is only asserted by Dr. Vishnuvajjala and Ms. Wersto); id. at 35 (basing tenth claim on the FDA threatening Dr. Smith if he spoke to others about FDA matters). As the Court has already explained, and as the defendants correctly note, these are "classic claims of whistleblower retaliation," Defs.' Mem. at 11, that give rise to cognizable claims under the CSRA's administrative and remedial scheme, see 5 U.S.C. §§ 2302(a)(2), (b)(8); Stella, 284 F.3d at 142 ("Under no circumstances does the [CSRA, as amended by the Whistleblower Protection Act,] grant the District Court jurisdiction to entertain a whistleblower cause of action brought directly before it in the first instance."). Given that these claims are subject to the CSRA, the plaintiffs must first "exhaust[] . . . [their] administrative remedies [a]s a jurisdictional prerequisite to suit." Weaver, 87 F.3d at 1433. But the plaintiffs have not done so. See Am. Compl. ¶¶ 121-23 (explaining that administrative remedies are still being pursued for the defendants' retaliatory actions); Defs.' Mem., ECF No. 31-5, Ex. 5 (Office of Special Counsel Letter to Congressional Members) at 1 n.1 (noting that Office of Special Counsel is investigating "prohibited personnel practices that the complainants have alleged"). The Court must, therefore, dismiss these claims for lack of jurisdiction.

### 1. The Plaintiffs' Contentions Regarding Claim One

Most of the plaintiffs' arguments as to why the CSRA should not preclude the Court from assuming jurisdiction over these claims grossly miss the mark as they focus heavily on the merits

of the plaintiffs' claims, which are irrelevant to the jurisdictional inquiry under a Rule 12(b)(1)

motion to dismiss.  See Pls.' Opp'n at 18-19 (discussing how "taking" of private emails

constitutes a "taking" of private property in violation of the Takings Clause under the Fifth

Amendment); id. at 16-17, 22-23, 31 (discussing the First Amendment right to communicate

with counsel); id. at 30-31 (discussing the First Amendment right to free speech and to associate

freely); see also Elgin, _ U.S. _, _, 132 S. Ct. at 2136 (explaining that preclusion under the

CSRA is determined by employee status and the challenged government actions, regardless of

the constitutional implications of those actions).

The plaintiffs posit several reasons why the Court has jurisdiction over their first claim.

They argue that there are "exceptions" to CSRA preclusion that are applicable to them and so

they need not exhaust their administrative remedies before bringing this suit.  Pls.' Opp'n at 14,

18.  For example, they identify "certain actions by supervisors against federal employees, such as

wiretapping, warrantless searches, or uncompensated takings, . . . [are] not . . . defined as

'personnel actions' within the statutory scheme."  Bush, 462 U.S. at 385 n.28.  And according to

the plaintiffs, because the first claim is based in part on a violation of the Takings Clause of the

Fifth Amendment, which is not a "personnel action," then CSRA preclusion does not apply to

this claim.  See Pls.' Opp'n at 14, 18 (quoting Bush, 462 U.S. at 385 n.28); see also Stewart v.

Evans, 275 F.3d 1126, 1130 (D.C. Cir. 2002) ("Bush virtually compels the conclusion that the

[CSRA]" does not preclude a claim based on a "warrantless search.").

The Court is not persuaded by this argument as it overlooks the fact that the alleged

constitutional violations in the first claim are derived from the FDA's alleged targeted

surveillance of the plaintiffs, which the Court has already determined is a prohibited "personnel

action" under the CSRA.  See 5 U.S.C. § 2302(a)(2)(A)(iii).  Although the plaintiffs' first claim

may have a "constitutional nature" to it, that does not mean it is removed from the purview of the CSRA. Elgin, _ U.S. at _, 132 S. Ct. at 2136 ("[CSRA] . . . exclusivity does not turn on the constitutional nature of an employee's claim, but rather on the type of the employee and the challenged employment action." (emphasis added)). Neither Bush, 462 U.S. at 385 n.28, nor Stewart, 275 F.3d at 1130, convinces the Court otherwise, as these cases do not involve allegations of unconstitutional conduct that arise from prohibited personnel actions under the CSRA.[10]

Moreover, the Court refuses to permit the plaintiffs to manipulate the jurisdiction of the Court based on their "clever drafting of the complaint" or "artful pleading." Steadman v. Governor, U.S. Soldiers' & Airmen's Home, 918 F.2d 963, 967-68 (D.C. Cir. 1990) ("To permit the district court's assertion of jurisdiction would simply put a premium on clever drafting of a complaint. 'It would require the suspension of disbelief to ascribe to Congress the design to allow its careful and thorough remedial scheme to be circumvented by artful pleading.'" (quoting Brown v. General Servs. Admin., 425 U.S. 820, 833 (1976))). The plaintiffs cannot bypass the CSRA by merely recasting prohibited personnel actions that fall under the CSRA as constitutional violations such that they fall outside the reach of the CSRA. This is especially so here, as the plaintiffs are concurrently pursuing administrative relief for claims that are substantially similar to the ones before the Court. See Am. Compl. ¶¶ 121-23 (explaining that "additional review procedures" have been "trigger[ed]" as a result of their filing with Office of Special Counsel); Defs.' Mem., Ex. 6 (Office of Special Counsel Press Release) at 1 (deciding to "broaden[] the scope of [the] . . . investigation into the surveillance of employees' emails by the .

_____

[10] The plaintiffs rely on a similar line of reasoning for claims two, three, four and ten. Pls.' Opp'n at 28-29, 31 (characterizing defendants' prohibited personnel actions as "warrantless searches, uncompensated takings[,] and takings without due process"). The Court rejects the plaintiffs' logic for the sustainability of these claims on the same grounds as claim one.

. . [FDA]" because "the whistleblowers allege[d] that the [FDA] reviewed disclosures intended specifically for [the Office of Special Counsel], and that the [FDA] also monitored communications of employees who were suspected of blowing the whistle on [the] FDA's approval of unsafe medical devices.").

The plaintiffs also contend that the "Little" Tucker Act, 28 U.S.C. § 1346(a)(2) (2012), confers jurisdiction on the Court over their first claim because they are claiming less than $10,000.00 from the government for an unconstitutional "taking" of private party.[11] Pls.' Opp'n at 18-19. But where, as here, jurisdiction under the Tucker Act is predicated on a "review of an underlying personnel action," the jurisdiction mandates of the CSRA control. Bobula v. U.S. Dep't of Justice, 970 F.2d 854, 857 (Fed. Cir. 1992) ("[T]he Little Tucker Act [does not] explicitly provide[] for review of an underlying personnel action. To the extent that the courts prior to the CSRA have interpreted the Little Tucker Act . . . as providing for review of an underlying federal personnel action, such judicial interpretations must give way to the congressional intent to replace the haphazard arrangements for administrative and judicial review of personnel action with the CSRA." (internal quotations omitted)).

Further attempting to justify the Court's jurisdiction over the first claim, the plaintiffs argue that the Court can hear cases involving violations of the Fifth Amendment where injunctive or declaratory relief is sought. See Pls.' Opp'n at 19. Assuming that this is an accurate statement of the law, it is nevertheless inconsequential as they have brought a claim

_____

[11] Despite the plaintiffs' allegations of unconstitutional "takings," the plaintiffs acknowledge that the defendants' "takings" had no monetary value. Pls.' Opp'n at 18-19. The Court, fortunately, need not assess whether jurisdiction would be proper under the Little Tucker Act if a plaintiff's claim for an unconstitutional "taking" has no monetary value—which certainly satisfies the under $10,000 limitation. Further, the Court notes that although the plaintiffs cite several bases for the Court having subject matter jurisdiction, see Am. Compl. ¶ 1, aside from the Little Tucker Act, they never seriously contend that any of these bases could override the preclusionary effect of the CSRA.

founded upon prohibited personnel actions under the CSRA.[12]  See Elgin, _ U.S. at _, 132 S. Ct. at 2132 (holding that the "CSRA precludes district court jurisdiction over . . . claims even though they are constitutional claims for equitable relief").

Finally, the plaintiffs argue that the Office of Special Counsel and the Merit Systems Protection Board, administrative bodies responsible for investigating the plaintiffs' complaints under the CSRA, are unable to provide some of the relief they seek.  Pls.' Opp'n at 19.  But an inability to obtain all of the relief the plaintiffs desire does not excuse their obligation to exhaust their administrative remedies.  See Spagnola v. Mathis, 859 F.2d 223, 227 (D.C. Cir. 1988) ("[I]t is the comprehensiveness of the statutory scheme involved, not the adequacy of specific remedies extended thereunder, that counsels judicial abstention[.]"); Hunt v. U.S. Dep't of Agric., 740 F. Supp. 2d 41, 49 (D.D.C. 2010) ("Even if the remedies afforded by the CSRA in this particular case are inadequate, as [the plaintiff] asserts, such a circumstance does not advance [the plaintiff's] position [that the plaintiff can bypass the CSRA]." (citing Bush, 462 U.S. at 388)).

### 2.  The Plaintiffs' Contentions Regarding Claim Eight

Hoping to provide a basis for the Court's jurisdiction over the eighth claim, the plaintiffs rely heavily on Weaver, 86 F.3d at 1434, for the proposition that at least Dr. Vishnuvajjala and Ms. Wersto should be permitted to proceed on the this claim because they are challenging the "chilling effect" caused by the defendants' covert surveillance "program."  See Pls.' Opp'n at 16, 24-28; Am. Compl. ¶¶ 172-77.  This analogy they ask the Court to make between this case and Weaver is flawed.

---

[12]  E. Enters. v. Apfel, 524 U.S. 498, 522 (1998) and Crocker v. U.S., 37 Fed. Cl. 191, 194-95 (1997), are inapposite in many respects.  Critically, though, neither case contains allegations of prohibited personnel actions under the CSRA that led to the constitutional violations of the Fifth Amendment.

In Weaver, the State Department had a Foreign Affairs Manual, which required that
materials employees wished to have published had to undergo "prepublication review" by the
agency.  86 F.3d at 1431-32.  When the plaintiff failed to abide by this "regulation," he received
an "oral admonishment" for the transgression.  Id. at 1432.  The plaintiff eventually filed suit
challenging the constitutionality of both the oral admonishment and the State Department's
regulation.  See id. at 1432-33.  Notably, the District of Columbia Circuit held that the district
court lacked jurisdiction to hear the plaintiffs' oral admonishment claim for which the plaintiff
had not pursued administrative relief under the CSRA.  See id. at 1433 ("The exhaustion
requirement generally applies as well to claims arising directly under the Constitution . . . when
such claims are "'premised on the same facts'" as the plaintiff's CSRA claims . . . ." (quoting
Steadman, 918 F.2d at 967)).  The Circuit ruled, however, that the plaintiff's constitutional
challenge to the State Department regulation could proceed without exhausting administrative
remedies under the CSRA because it "st[ood] independently" of the challenge to the oral
admonishment.  Id.  at 1434.  In other words, the challenge was a "pre-enforcement" attack on
[the] regulation."  Id.

Here, none of the plaintiffs mount an attack on a "regulation" or "rule" of any of the
defendants.  As the defendants correctly point out, "the plaintiffs in this case do not challenge a
regulation or rule that 'stands independently' from the personnel actions of which they
complain."  Defs.' Reply at 10.  "Rather [they] complain of a series or collection of personnel
actions . . . ."  Id.  Underlying a "pre-enforcement" challenge to a government regulation or rule
is the presumption that the government's regulation or rule had already been in place prior to the
government enforcing that regulation or rule against an employee.  See Weaver, 86 F.3d at 1432
("Even before receiving the admonishment, [the plaintiff] filed suit challenging [the regulation in

the State Department's Foreign Affairs Manual] on First Amendment grounds . . . ." (emphasis added)).  Aside from conclusory allegations in the complaint, the plaintiffs have not met their burden of demonstrating that the defendants had a "targeted surveillance program" in effect before each of the plaintiffs was subjected to targeted surveillance.  Just because the plaintiffs were allegedly subjected to similar prohibited personnel actions by the defendants, does not mean that the defendants were acting pursuant to a "regulation" or "rule."  None of the other cases cited by the plaintiffs require a different conclusion.[13]

This is not the "unusual case in which the constitutional claim[s] raise[] issues totally unrelated to the CSRA."  Steadman, 918 F.2d at 967; see also Weaver, 87 F.3d at 1434 (holding that exhaustion under the CSRA is necessary when a "constitutional claim is intertwined with . . . [and] the sole basis [thereof is a CSRA claim]" (emphasis added)).  And the eighth claim is not a constitutional claim that is factually independent of the reprisals for whistleblower activities.  Rather, the events supporting the constitutional violations alleged in the eighth claim are a direct result of the defendants' personnel practices challenged by the plaintiffs.   See, e.g., Pls.' Opp'n at 6 ("Targeted [s]urveillance" was directly triggered based on the whistleblower disclosures [the] [p]laintiffs were making (or suspected of making) to various outside entities."); Am. Compl. ¶ 33 ("All six [p]laintiffs and all individuals subject to [t]argeted [s]urveillance by association with the [p]laintiffs were targeted because of their viewpoints as whistleblowers and because of their protected speech to Congress and other appropriate authorities."); id. at 32-33

---

[13]  Additional examples, cited by the plaintiffs, of courts permitting "pre-enforcement" constitutional challenges of government regulations that restrict employee speech include United States v. Nat'l Treasury Emps. Union, 513 U.S. 454, 457 (1995) and Sanjour v. EPA, 56 F.3d 85, 91 (D.C. Cir. 1995) (en banc).   Pls.' Opp'n at 15-16, 25.  Because the Court does not find that the eighth claim is a "pre-enforcement" challenge to a governmental "regulation" or "rule," these cases are not helpful.

(basing claim eight upon "targeted surveillance of Dr. Vishnuvajjala and Ms. Wersto, and the threats of disciplinary action against them").

### b. Claim Nine

The plaintiffs' ninth claim, brought on behalf of Dr. Smith, Dr. Nicholas, and Mr. Hardy, alleges that the defendants' targeted surveillance of employees who are whistleblowers, or their associates, has impeded these plaintiffs' efforts to lawfully access information from other employees of the defendants. See Am. Compl. ¶¶ 178-84. This, they argue, is a violation of the First Amendment "right to receive information." See, e.g., id. ¶¶ 181-82 (alleging that FDA's targeted surveillance has "chilling effect" that "impedes" the ability of certain of the defendants to "access lawful information"). The defendants contend that these plaintiffs lack standing to assert this claim. See Defs.' Mem. at 25; Defs.' Reply at 18-19.

The Constitution limits the jurisdiction of this Court to resolving only "cases" or "controversies." Lance v. Coffman, 549 U.S. 437, 439 (2007); Fla. Audubon Soc'y v. Bentsen, 94 F.3d 658, 663 (D.C. Cir. 1996). The party that invokes federal jurisdiction bears the burden of establishing the elements of standing "in the same way as any other matter on which the plaintiff bears the burden of proof." Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992). The constitutional minimum of standing is satisfied if a plaintiff shows that the claims "spring from an 'injury in fact'—an invasion of a legally protected interest that is 'concrete and particularized,' 'actual or imminent,' [and] 'fairly traceable' to the challenged act of the defendant, and likely to be redressed by a favorable decision in the federal court." Navegar, Inc. v. United States, 103 F.3d 994, 998 (D.C. Cir. 1997) (quoting Lujan, 504 U.S. at 560-61). If an alleged injury is hypothetical or conjectural, the "injury-in-fact" requirement is not satisfied. See Lujan, 504 U.S. at 560.

Further, "[i]t is well established that [plaintiffs], as listeners, can suffer injury from government regulations that prevent speakers from saying what the listeners wish to hear." Competitive Enter. Inst. v. U.S. Dep't of Transp., 856 F.2d 1563, 1566 (D.C. Cir. 1988) (citing Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc., 425 U.S. 748 (1976)). "[W]here a speaker exists . . . the protection afforded [by the First Amendment] is to the communication, to its source and to its recipients both." Va. State Bd. of Pharmacy, 425 U.S. at 756. But "[t]he right to receive information . . . is not established in every case where a person wishes to receive information." Gregg v. Barrett, 771 F.2d 539, 547 (D.C. Cir. 1985). An allegedly aggrieved listener, who wishes to receive information but for a government regulation, must be able to identify a "willing speaker." Competitive Enter. Inst., 856 F.2d at 1566 ("Whether the injury is phrased as a deprivation of information that the listener would find useful or the interference with a relationship between speaker and listener, a government regulation cannot cause that injury unless petitioners can identify a willing speaker.").

Noticeably absent from the plaintiffs' complaint is the identity of any specific "willing speaker," which is necessary to show an injury-in-fact for purposes of standing to assert this claim. See id. ("[A] government regulation cannot cause that injury unless petitioners can identify a willing speaker[.]").[14] Claim nine repeatedly alludes to "employees or []contractors[]" as individuals who have potentially had their speech "chilled" as a result of the defendants targeted surveillance. Am. Compl. ¶¶ 180-82. These generic terms—which reflect mere conjecture—do not meet the level of specificity needed to satisfy the constitutional requirement

---

[14] Despite the plaintiffs' recognition that the defendants have not challenged the merits of claim nine, Pls.' Opp'n at 32 n.15, they nevertheless discuss them in length, id. at 32-35. This again is irrelevant to the defendants' motion to dismiss.

of standing when pleading a violation of the First Amendment right to receive information.  See Competitive Enter. Inst., 856 F.2d at 1566.

The plaintiffs attempt to cure this deficiency through the submission of three affidavits, attached to their opposition memorandum, from Mr. Hardy, Dr. Smith, and Ms. Wersto that they contend "establish the facts necessary to meet the 'willing speaker' standard."  Pls.' Opp'n at 32; id., Ex. 4 (Affidavit of Nancy Wersto); Pls.' Opp'n, Ex. 5 (Affidavit of Julian Nicholas); Pls.' Opp'n, Ex. 6.  (Affidavit of Dr. Robert C. Smith).  Although the plaintiffs' representation about the substance of these affidavits may be accurate, the Court will not consider the belated affidavits as "[i]t is a well-established principle of law in this Circuit that [the plaintiffs] may not amend [their] complaint by making new allegations in [the] opposition brief."  Budik v. Ashley, _ F. Supp. 2d _, _, No. 12-cv-1949(RBW), 2014 WL 1423293, at *8 (D.D.C. Apr. 14, 2014) (Walton, J.) (citing Larson v. Northrop Corp., 21 F.3d 1164, 1173-74 (D.C. Cir. 1994)).  Thus, the plaintiffs have not established that Mr. Hardy, Dr. Smith, and Ms. Wersto have standing. The Court, therefore, lacks jurisdiction over this claim.

### c.  Claim Eleven

The eleventh claim in the complaint accuses the FDA of violating the First Amendment. Am. Compl. at 35.  Specifically, the plaintiffs assert that the FDA, through its targeted surveillance of its employees, has suppressed the speech of its employees, and thus violated the First Amendment rights of "the public" to associate with the plaintiffs, including Mr. Hardy, and to obtain information about its government.  See Am. Compl. ¶¶ 188-92.  In response, the defendants contend that the plaintiffs lack standing to pursue a claim on behalf of "the public." Defs.' Mem at 25.

The Supreme Court has "consistently held that a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large" does not have standing. Lujan, 504 U.S. at 573-74; see also Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec., 653 F.3d 1, 9-10 (D.C. Cir. 2011) (explaining a litigant "'generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties" (quoting Warth v. Seldin, 422 U.S. 490, 499 (1975)).

What has been forbidden by the Supreme Court and this Circuit is exactly what the plaintiffs want to do here. Claim eleven seeks to uphold the public's First Amendment rights to free speech and association on the basis that the FDA's targeted surveillance of certain of its employees curtails both of these rights. Am. Compl. ¶¶ 189-92. This claim amounts to nothing more than a generalized grievance against the FDA and its alleged targeted surveillance. See Lujan, 504 U.S. at 573; Schwaninger & Associates v. FCC, No. 00-1026, 2000 WL 817892, at *1 (D.C. Cir. May 19, 2000) ("To the extent petitioner bases its standing on its interest, shared with other members of the public, in assuring that the FCC does not engage in improper or unethical activity, this claim amounts to nothing more than a generalized grievance shared in substantially equal measure by all or a large class of citizens, which by itself does not warrant exercise of jurisdiction." (internal citations and quotations omitted)). Having only pleaded a generalized grievance on behalf of the members of the public in claim eleven, the plaintiffs lack standing to pursue this claim.

The plaintiffs cite Sec'y of State of Md. v. Joseph H. Munson Co., 467 U.S. 947 (1984) and Sanjour v. EPA, 7 F. Supp. 2d 14, 16 (D.D.C. 1998), for the proposition that they have

standing to sue on behalf of the public concerning First Amendment violations that chill speech. Pls.' Opp'n at 35-36. But these cases are inapposite. Munson allowed a litigant "to assert the rights of another without regard to the ability of the other to assert his own claims," but only "where the claim is that a statute is overly broad in violation of the First Amendment." 467 U.S. at 957 (emphasis added). No such challenge of a statute has been made by the plaintiffs here. And in Sanjour, the Court considered the "interests of both potential audiences and . . . other present and future employers," in the context of examining the proper scope of "an injunction granting government-wide relief," and not in the context of assessing standing. Sanjour, 7 F. Supp. 2d at 16 (internal quotations omitted).

### d. Claim Twelve

The final claim of the complaint alleges that the defendants violated the Lloyd-La Follette Act, 5 U.S.C. § 7211. Am. Compl. ¶¶ 193-97. The Lloyd-La Follette Act provides that an employee's right "to petition Congress or a Member of Congress, or to furnish information to either House of Congress, or to a committee or Member thereof, may not be interfered with or denied." 5 U.S.C. § 7211. The defendants argue there is no private right of action under this statute. See Defs.' Mem. at 26; Defs.' Reply at 20. The plaintiffs, including Mr. Hardy, have not responded to this argument—they merely explain their rationale as to why they included this claim in the complaint. Pls.' Opp'n at 27 n.12. Accordingly, the Court will deem the plaintiffs to have conceded the motion to dismiss for lack of subject matter jurisdiction as to this claim. See Lewis v. District of Columbia, No. 10-5275, 2011 WL 321711, at *1 (D.C. Cir. Feb. 2, 2011) (per curiam) ("'It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.'") (quoting Hopkins v.

<u>Women's Div., Gen. Bd. of Global Ministries</u>, 284 F. Supp. 2d 15, 25 (D.D.C. 2003), <u>aff'd</u>, 98 F.

App'x 8 (D.C. Cir. 2004)); Local Civ. R. 7(b).

**C. Whether Paul T. Hardy's Claims Are Precluded**

Prior to joining this suit with the other plaintiffs, Mr. Hardy had sought administrative

relief for the defendants' reprisals for his whistleblower activities under the CSRA, but failed to

have the merits of his complaint fully adjudicated because he was not an "employee" for

purposes of the CSRA. Defs.' Mem. at 10-11 (citing <u>Hardy</u>, 117 M.P.S.R. at 175); Am. Compl.

¶¶ 109-14. Thus, there is no dispute that the CRSA does not afford Mr. Hardy administrative

remedies. Defs.' Mem. at 11 ("[Mr. Hardy] is not, as a matter of law, covered by the CSRA");

Pls.' Opp'n at 39 (agreeing that "Mr. Hardy falls completely outside of the ambit of the CSRA").

But the defendants insist Mr. Hardy is still precluded from bringing this lawsuit because he has

not exhausted his administrative remedies as an officer of the Public Health Service

Commissioned Corps ("Commissioned Corps") officer. Defs.' Mem. at 20. Specifically, the

defendants note that he has not sought relief from the Board for Correction of Public Health

Service Commissioned Corps for his claims of reprisals for whistleblower activity. <u>See id.</u> at 6-

8; Defs.' Reply at 14-16. In response, the plaintiffs challenge the applicability and adequacy of

seeking administrative relief from the Board for Correction of Public Health Service

Commissioned Corps. <u>See</u> Pls.' Opp'n at 41-42.

The Court agrees with the plaintiffs that as an officer of the Public Health Service

Commissions Corps he was not statutorily protected from reprisals for whistleblower activity at

the time he joined the other plaintiffs in filing this case, and thus had no administrative remedies

to exhaust. <u>See</u> <u>Verbeck v. United States</u>, 89 Fed. Cl. 47, 61-62 (Fed. Cl. 2009). At that time, no

statute protected whistleblowers who were officers of the Public Health Service Commissioned

Corps. As the Court held in Verbeck:

> As an officer in the [Public Health Service] Commissioned Corps, [the plaintiff]
> was a member of a uniformed service and is thus not eligible for the protections
> of the whistleblower act pertinent to civilian employees of the federal
> government. Furthermore, [the plaintiff] is not able to avail herself of the
> Military Whistleblower Protection Act because Congress, in enacting and
> subsequently amending 42 U.S.C. § 213a [(2012)], has specified which provisions
> of Title 10 of the United States Code shall apply to the Commissioned Corps but
> has not included the Military Whistleblower Protection Act as one of the
> incorporated provisions. The resulting gap in coverage means that, as a member
> of the [Public Health Service] Commissioned Corps, [the plaintiff] was not
> entitled to receive the protection of whistleblower protection provisions found in
> the United States Code.

Id. (internal citations omitted).[15]

Subject matter jurisdiction, however, does not flow as a matter of course from the

unavailability of administrative remedies. This Court was recently confronted with a similar

situation in Davis v. Billington, _ F. Supp. 2d. _, _, 2014 WL 2882679, at *4-*5 (D.D.C. June

25, 2014). There, as here, the plaintiff was "not entitled to administrative review under the

CSRA." Id. at *5. In such circumstances, only if "it is clear that Congress intended to preclude

all judicial review of colorable constitutional claims, [can] the Court . . . find that it does not

have jurisdiction." Id. (internal citation omitted). For example, "when Congress intends to bar

---

[15] The defendants cite several provisions of the Public Health Service Commissioned Corps Personnel Manual as
providing administrative avenues of relief that Mr. Hardy could have sought before instituting this action. See
Defs.' Mem. at 20-23; Defs.' Reply at 14-17. However, in light of the absence of any statutory protections for
whistleblowing officers of the Public Health Service Commissioned Corps, the Court finds the defendants'
arguments speculative, at best, as to whether administrative relief was available for Mr. Hardy. See Verbeck, 89
Fed. Cl. at 61 ("The government asserts that protections afforded whistleblowers do not apply to [the Public Health
Service] Commissioned Corps. The government notes that 10 U.S.C. § 1034, the Military Whistleblower Protection
Act, is the only statutory provision governing whistleblowing that a member of the uniformed services could invoke,
but the government asserts that the Military Whistleblower Protection Act does not apply to the Commissioned
Corps."). Notably, the government in Verbeck did not identify any provisions in the Public Health Service
Commissioned Corps Personnel Manual that offered protection for whistleblowers in the Public Health Service
Commissioned Corps.

judicial review altogether, it typically employs . . . unambiguous and comprehensive" language.

Lindahl v. Office of Personnel Mgmt., 470 U.S. 768, 779-80 (1985).  In a footnote illustrating

this point, the Supreme Court in Lindahl referenced the language of 5 U.S.C. § 8128(b), which

addresses compensation for work-related injuries and states:

> The action of the Secretary [of Labor] or his designee in allowing or denying a
> payment under this subchapter is—(1) final and conclusive for all purposes and
> with respect to all questions of law and fact; and (2) not subject to review by
> another official of the United States or by a court by mandamus or otherwise.

Id. at 780, 780 n.13 (quoting 5 U.S.C. § 8128(b)).  The Court provided as a further example the

statutory language of 38 U.S.C. § 211(a), which addresses benefits for veterans and provides

that:

> The decisions of the Administrator on any question of law or fact under any law
> administered by the Veterans' Administration providing benefits for veterans and
> their dependents or survivors shall be final and conclusive and no other official or
> any court of the United States shall have power or jurisdiction to review any such
> decision by an action in the nature of mandamus or otherwise.

Id. (quoting 38 U.S.C. § 211(a) (2012)).  No such language in either the CSRA or the Military

Whistleblower Protection Act definitively prohibits officers of the Public Health Service

Commissioned Corps from having constitutional claims considered by a court.[16]  The fact that

they lacked statutory protection does not necessarily mean they had no recourse in the district

courts.  The District of Columbia Circuit has "held that the district courts are open to challenges

seeking equitable relief on constitutional grounds, at least where the CSRA does not provide an

adequate alternative route to judicial review."  Suzal v. Dir., U.S. Info. Agency, 32 F.3d 574, 586

---

[16]  The Military Whistleblower Protection Act of 1988, 10 U.S.C. § 1034(b), protects members of the "armed
forces" from reprisals for whistleblower activities.  "The term 'armed forces' means the Army, Navy, Air Force,
Marine Corps, and Coast Guard."  Id. § 101(a)(4).  Because this definition excluded officers of the Commissioned
Corps until recently, as the plaintiffs point out, they were left without whistleblowing protection.  The exclusion of
the Commissioned Corps from the definition of "armed services," and thus certain statutory protections afforded to
them, however, does not arise to the unequivocal language found in the statutory examples referenced in Lindahl.

(D.C. Cir. 1994) (citing cases). Therefore, "in keeping with the longstanding law of this Circuit that favors permitting plaintiffs the opportunity to bring constitutional claims for injunctive relief in the district court," Davis, _ F. Supp. 2d. _, _, 2014 WL 2882679 at *6, the Court has jurisdiction over Mr. Hardy's constitutional claims so long as some of the relief requested can be granted by the Court. See id. (citing James Madison Ltd. by Hecht v. Ludwig, 82 F.3d 1085, 1092 (D.C. Cir. 1996)).

The Court is unconvinced, at this juncture, that it could not grant at least some relief to Mr. Hardy. The primary relief sought by Mr. Hardy is reinstatement into the Public Health Service Commissioned Corps.[17] See Pls.' Opp'n at 39, 43; Am. Compl. ¶ (w). The defendants do not argue that the Court lacks the authority to grant this relief. Rather, they challenge the adequacy of the relief, and thus Mr. Hardy's standing to bring claims against the defendants. See Defs.' Mem. at 23-24; Defs.' Reply at 17. They contend that if Mr. Hardy were reinstated, he would be immediately discharged because the Public Health Service Commissioned Corps never promoted him, which is a prerequisite to maintaining his employment with the Public Health Service Commissioned Corps. See Defs.' Mem. at 23-24; Defs.' Reply at 17; see also 42 U.S.C. § 211(g) ("If . . . an officer of the Regular Corps . . . is found . . . not to be qualified for promotion he shall be separated from the Service."). The defendants' contention is conclusory at best. They have not explained why upon reinstatement, the Public Health Service Commissioned Corps could not reevaluate Mr. Hardy's work performance and promote him— without regard to his whistleblower activities. Indeed, as alleged in the complaint, the failure to promote Mr. Hardy appears to be solely on the basis of his protected speech. See Am. Compl. ¶ 158 ("in retaliation for Mr. Hardy's speech on matters of public concern . . . Mr. Hardy

---

[17] Despite pleading many other types of relief, this is the only one that the defendants seriously challenge in their motion to dismiss.

[received] an extremely negative performance review"); id. ¶ 159 ("None of Mr. Hardy's speech disrupted the workplace operations of the [Public Health Service], [the] FDA, or U.S. government.").

Despite the Court's finding that it has subject matter jurisdiction over Mr. Hardy's claims, that does not end the jurisdictional inquiry. The plaintiffs admit that Congress, recognizing a "gap" in whistleblower protection for officers of the Public Health Service Commissioned Corps, passed an amendment in July 2012, after this case was initiated, that created "a statutory remedy" for whistleblowers such as Mr. Hardy. Pls.' Opp'n at 40 (citing Pub. L. No. 112-144, § 1129 (codified as amended in 42 U.S.C. § 213a(a)(18)) (emphasis added); 158 Cong. Rec. S3491 (daily ed. May 23, 2012) (statement of Rep. Grassley) ("I offered an amendment that expands whistleblower protection for uniformed employees of the Public Health Service. It corrects the anomaly pointed out by [Verbeck, 89 Fed. Cl. at 61-62] and ensures that officers in the Public Health Service have some baseline whistleblower protection. It expressly includes the commissioned corps of the Public Health Service within the protections of the Military Whistleblower Protection Act."). So now under 42 U.S.C. § 213a(a)(18), "[c]ommissioned officers of the [Public Health Service] . . . are entitled to all the rights, benefits, and immunities now or hereafter provided for commissioned officers of the Army . . . under [10 U.S.C. § 1034]," which "prohibits retaliatory personnel actions" for whistleblower activities. The plaintiffs further admit "that Mr. Hardy can use [this amendment] to obtain reinstatement." Pls.' Opp'n at 40 n.16 (emphasis added). Yet the parties have not considered whether this Court can apply the recently enacted amendment, despite the fact that it came into effect after this case commenced.

Regardless of whether the parties addressed this issue, the Court has an obligation to do so because it affects its jurisdiction over Mr. Hardy's claims. See Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." (emphasis added)). Although neither the amendment nor the legislative history appears to indicate that the amendment's protections should be afforded to officers of the Public Health Service Commissioned Corps before its effective date, the Court is not necessarily prevented from reaching that conclusion. See Landgraf v. USI Film Prods., 511 U.S. 244, 273 (1994) ("Even absent specific legislative authorization, application of new statutes passed after the events in suit is unquestionably proper in many situations.").

Generally, the "retroactive" application of laws is disfavored. Id. at 267-69. The general prohibition against "retroactivity" stems from the fact that it "would impair rights a party possessed when [the party] acted, increase a party's liability for past conduct, or impose new duties with respect to the transactions already completed." Id. at 280. But "[a] statute does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment." Id. at 269. Indeed, the Supreme Court has "regularly applied intervening statutes conferring or ousting jurisdiction, whether or not jurisdiction lay when the underlying conduct occurred or when the suit was filed." Id. at 274. "Present law normally governs in such situations because jurisdictional statutes speak to the power of the court rather than to the rights or obligations of the parties." Id. at 274 (internal quotations omitted). And that is because the "[a]pplication of a new jurisdictional rule usually takes away no substantive right but simply changes the tribunal that is to hear the case." Id. (quoting Hallowell v. Commons, 239 U.S. 506, 508 (1916)). Accordingly, the District of Columbia Circuit has ruled that following changes in procedural law, this Court must "apply the law in effect at the time it

renders its decision, unless doing so would result in manifest injustice." <u>Moore v. Agency for Int'l Dev.</u>, 994 F.2d 874, 878-79 (D.C. Cir. 1993); <u>see also</u> <u>LaFontant v. I.N.S.</u>, 135 F.3d 158, 162 (D.C. Cir. 1998) (concluding that "a statute that takes away jurisdiction from the federal courts and vests exclusive authority in an executive agency to resolve certain disputes be considered a jurisdictional rule . . . that simply changes the tribunal that is to hear the case" (internal quotations omitted)); <u>id.</u> (recognizing that "jurisdictional change from an Article III court to an administrative decision maker is simply a change" in who hears the case); <u>Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State</u>, 104 F.3d 1349, 1352 (D.C. Cir. 1997) ("[c]hanges in procedural rules will not often raise problems of retroactivity" because no substantive rights will be lost).

Because this Circuit requires the Court to apply "the law in effect at the time it renders its decision," <u>Moore</u>, 994 F.2d at 879-80, the Court must apply 42 U.S.C. § 213a(a)(18) in this case and direct Mr. Hardy to seek his "statutory remedy," Pls.' Opp'n at 40 n.16, for any of his claims regarding the defendants' reprisals against his whistleblower activities. Requiring Mr. Hardy to present his allegations to "an administrative decision maker" does <u>not</u> divest him of any substantive right. <u>LaFontant</u>, 135 F.3d at 162; <u>see also</u> <u>Landgraf</u>, 511 U.S. at 274; <u>Legal Assistance</u>, 104 F.3d at 1352. All of the alleged whistleblower reprisals he suffered during his time as an officer of the Public Health Service Commissioned Corps working at the FDA can still be investigated and remedied, as he will be afforded whistleblower protection under 10 U.S.C. § 1034. <u>See</u> 42 U.S.C. § 213a(a)(18) (providing whistleblower protection under 10 U.S.C.§ 1034 to Commissioned Corps officers of the Public Health Service); <u>see also</u> <u>Hernandez v. United States</u>, 38 Fed. Cl. 532, 535-36 (Fed. Cl. 1997) (detailing "investigative and

administrative remedies for alleged retaliatory actions" under 10 U.S.C. § 1034.[18]  The Court's

application of the amendment is not impermissibly retroactive because the amendment is

procedural in nature and does not substantively affect Mr. Hardy's entitlement to relief.  See

LaFontant, 135 F.3d at 163; Pls.' Opp'n at 40 n.16.[19]  Further, as 10 U.S.C. § 1034 "provides

strictly administrative remedies" and "does not afford . . . a private cause of action" for a

plaintiff, Hernandez, 38 Fed. Cl. at 536, the Court must dismiss his claims against the defendants

that are based on reprisals for his whistleblower activities.  Therefore, with respect to Mr. Hardy,

claims one through five will be dismissed for lack of subject matter jurisdiction.[20]

## V.    CONCLUSION

For the foregoing reasons, the Court will dismiss all of the claims in the complaint

without prejudice.[21]

---

[18] If Mr. Hardy sought relief under 5 U.S.C. § 1214 for the defendants' prohibited personnel conduct in the first instance, the Court sees no reason why administrative relief would be inadequate under 10 U.S.C. § 1034.  See Pls.' Opp'n at 40 n.16 (recognizing that Mr. Hardy can use 10 U.S.C. § 1034 "to obtain reinstatement"); Hardy, 117 M.P.S.R. at 175 (using 5 U.S.C. § 1214 to obtain "reinstat[ement]"); Am. Compl ¶¶ 109-11 (same).

[19] This situation is a compelling candidate for the Court's application of a procedural rule enacted after the commencement of suit.  The impetus for congressional action appears to have been Mr. Hardy and his unsuccessful attempt to secure administrative relief for the allegations concerning the FDA's reprisals for his whistleblowing conduct. See Pls.' Opp'n at 40 ("Congress promptly acted soon after the [Merit Systems Protection Board's] Hardy decision and created a statutory remedy for [Commissioned Corps] whistleblowers."); 158 Cong. Rec. S3491 (daily ed. May 23, 2012) (statement of Rep. Grassley) ("[T]he FDA intentionally went after an employee because it knew this employee was not covered by the Whistleblower Protection Act . . . .  This employee in question was a member of the Public Health Service Commissioned Corps [.]").

[20] Claims six through eight, and ten, were not brought on behalf of Mr. Hardy.  Claims nine, eleven, and twelve, although based in part on retaliatory actions allegedly taken by the defendants, are already being dismissed on grounds unrelated to the failure to exhaust administrative remedies  under 10 U.S.C. § 1034.

[21] The Court has contemporaneously issued an Order consistent with this Memorandum Opinion.